FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 2 8 2009 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

MARY E. WALKER

**MEMORANDUM & ORDER**

**06-cv-05978 (NGG)**

Plaintiff,

-against-

MICHAEL J. ASTRUE,

Commissioner of Social Security,

Defendant.

------------------------------------------------------------------X

**NICHOLAS G. GARAUFIS, United States District Judge.**

Mary E. Walker ("Plaintiff" or "Walker") brings this action for judicial review under 42 U.S.C. § 405(g) challenging the final decision by defendant Commissioner of Social Security Michael J. Astrue ("Defendant" or "Commissioner") to deny Plaintiff's claim for insurance benefits within Title II of the Social Security Act. The court is presented with the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). The issues before this court are: (1) whether the Administrative Law Judge ("ALJ") failed to properly consider the functional impact of Plaintiff's obesity with her other impairments; (2) whether the ALJ erroneously applied the treating physician rule; and (3) whether the ALJ erred by failing to offer the Plaintiff the opportunity to testify by telephone. For the reasons that follow, this court grants the Commissioner's motion and affirms his decision.

1

# I. BACKGROUND

## A. Procedural History

Walker filed an application for Supplemental Security Income ("SSI") benefits on September 18, 2002. (Transcript of Record ("Tr.") at 39-41.) Walker stated the conditions that limited her ability to work were "high blood pressure, herniated disc [and] torn ligaments in both legs." (Tr. at 72.) On February 6, 2003, the Social Security Administration ("SSA") found her health conditions did not qualify for SSI benefits. (Id. at 27-30.) Walker requested a hearing before an ALJ which was scheduled on September 29, 2003. (Id. at 31, 35-38.) Walker failed to appear due to sickness and the hearing was adjourned until April 15, 2004 (the "April Hearing"). (Id. at 231, 244.) Walker again failed to appear at the rescheduled April Hearing. (Id. at 242.) Walker was represented at the April Hearing before ALJ Joseph B. Faraguna, by her attorney, Milton Braxter. (Id. at 240-49.) Her attorney attributed her absence to her inability to travel (Id. at 233, 234.) On July 26, 2004 the ALJ issued a decision, determining that Walker was not disabled and therefore not eligible for SSI benefits. (Id. at 15-20.) On September 29, 2004, Walker appealed the ALJ's decision to the Appeals Council (the "Council"). (Id. at 11.) The Council denied Walker's request on September 22, 2005, finding the additional evidence presented "d[id] not provide a basis for changing the [ALJ's] decision." (Id. at 4-7.) The ALJ's decision became final when the Council denied Walker's request. As a result, on November 6, 2006, Walker filed a pro se complaint, bringing this civil action against the Commissioner. On June 7, 2007, attorney Charles E. Binder filed a notice of appearance on behalf of Walker. The parties' motions for judgment on the pleadings subsequently followed.

## B.     Plaintiff's Personal and Employment History

Walker was born on May 21, 1955 and was forty-seven years old when she applied for SSI benefits. (Id. at 39.) Walker was living with her husband, son, daughter and granddaughter at the time. (Id. at 78.) In 1973, Walker graduated from high school and also completed a medical assistance program. (Id. at 76.) From 1989 to 2002, Walker volunteered part-time, three days a week as a Field Aide Leader for the Girl Scouts, earning $200 a month. (Id. at 16, 54.) Walker has no other history of employment. (Id. at 72-74.) As a volunteer with the Girl Scouts her duties included planning activities and attending field trips, meetings and conferences. (Id. at 54.) The volunteer work required the use of tools, technical knowledge, and writing reports. (Id. at 54.) In one disability questionnaire, Walker stated the heaviest weight she lifted while working was less than ten pounds. (Id. at 54). In another disability questionnaire, she stated the heaviest weight she lifted while working was 100 pounds, and frequently lifted fifty pounds or more. (Id. at 64.)

On July 11, 1999, Walker was hit by a motor vehicle as she was crossing a street. (Id. at 210.) Walker asserts that this accident impaired her ability to work. (Id. at 124.) On July 15, 2002, Walker stopped working for the Girl Scouts due to "herniated discs in neck, hypertension, torn ligaments in legs, hernia, anemia [and] one kidney." (Id. at 53, 63.)

## C.     Plaintiff's Medical History

### 1. Medical History Prior to SSI Application

In 1974 Walker was diagnosed and treated for hypertension.[1] (Id. at 136.) Over an approximately 15 year period, Walker underwent several operations: a left nephrectomy in 1983,

---

[1] Hypertension is "a condition in which the patient has a higher blood pressure than that judged to be normal." Taber's Cyclopedic Medical Dictionary 940 (17th ed. 1993). Generally elevated systolic pressure that is "above 140 mmHg or the diastolic above 90 mm" represents hypertension. Id. at 940-941. Though difficult to determine, "it is important to attempt to define the exact etiology," because "definitive and curative therapy can be instituted."

a thyroidectomy in 1990, and a hysterectomy in 1998. (Id. at 136, 175.) During her December 3, 1999 doctor's examination, Walker stood at five feet four inches and weighed 215 pounds. (Id. at 176.)

As mentioned above, Walker was involved in a motor vehicle accident on July 11, 1999. Walker was hit by a motor vehicle and fell to the ground, landing on her left knee. (Id. at 175.) She did not strike her head or lose consciousness. (Id. at 166, 213.) Her initial complaint was injury to her left knee. (Id. at 210-13.) For weeks following the accident she complained of cervical, lumbar, and lower extremity pains. (Id. at 172.) After the July 11, 1999 car accident, Walker's son drove her to the North Shore Hospital Emergency Room in Glen Cove. (Id. at 166, 213.) X-rays taken at the hospital of her lower extremities revealed normal bone and adjacent soft tissue structures. (Id. at 215.) Diagnosed with a contusion to her left leg, and prescribed Tylenol, Walker was released several hours later with a recommendation to follow up with her treating physician, Dr. George Dunn ("Dr. Dunn"). (Id. at 212.) Following the accident, Walker was seen by various medical specialists: a chiropractor, neurologist, and several orthopedic surgeons.

### a. Chiropractor: Dr. Biegel

On July 19, 1999, Walker saw a chiropractor, Dr. Gregg Biegel ("Dr. Biegel"). (Id. at 166-69.) Walker stated to Dr. Biegel that immediately after the accident she suffered from occasional dizziness, neck pain, right forearm pain, lower back pain, swelling in legs, left knee and ankle pain. (Id. at 166.) After a physical examination, Dr. Biegel concluded that, as a direct result of her motor vehicle accident, Walker suffered from cervical, thoracic, and lumbar sprains, cervical herniated discs, cervical and lumbar lordosis, right shoulder supraspinatus impingement,

---

Several types of hypertension include "h. benign, h., essential; h., Goldblatt; h., malignant; and h., portal..." Id. The record does not indicate whether Walker was diagnosed with any particular type of hypertension.

and left knee ligament sprain consistent with a tear in the horn of the meniscus. (Id. at 168.) Dr. Biegel's prognosis stated that her injuries would substantially impair her daily routine and recreational activities for the rest of her life. (Id.) Dr. Biegel prescribed chiropractic adjustment, electric muscle stimulation, and prone disc stretching, which she received at Hempstead Village Medical over a three month period in 1999. (Id. at 169, 185, 195-96.)

### b. Walker's X-Ray and Electrodiagnostic Testing

The record does not indicate which physician ordered Walker's July 21, 1999 x-ray and initial EMG testing. The exams, however, appear to have been conducted by the office of David Tubens, D.C. of Uniondale, N.Y. (Id. at 202-06.) The x-ray indicated Walker had an "increased abnormal curvature of the lumbar spine, reversal cervical spine C3-C7 and jamming of the posterior articular facets." (Id. at 202.) EMG testing of the motor and sensory nerves in the lower extremities indicated no abnormalities. (Id. at 203-06.)

### c. Neurologist: Dr. Yin

On August 6, 1999, Walker saw neurologist Dr. June Yin ("Dr. Yin"). (Id. at 185.) Walker complained of shoulder pain radiating down her right arm, neck pain with side to side movements with occasional numbness in right arm and intermittent low back and lower extremity pain. (Id.) After his examination, Dr. Yin found Walker to have "elevated muscle tone" in the cervical and lumbar and sacral paraspinal muscles while having normal muscle strength in her arms and legs. (Id. at 186.) Walker had limited range of motion in both her neck and lower back. (Id.) Dr. Yin conducted lower extremity electrodiagnostic testing, which indicated no abnormalities or evidence of peripheral neuropathy. (Id. at 189-91.) Laboratory results from hematology, urinalysis and clinical chemistry were within normal limits. (Id. at 105-07, 108-09.)

### d. Orthopedic Surgeon: Dr. Durant

On August 12, 1999, Walker saw orthopedic surgeon, Dr. Christopher Durant ("Dr. Durant"). Walker stated that she suffered from lower back pain, numbness radiating down her lower extremities, and left knee pain with instability and locking. (Tr. at 172.) Dr. Durant's examination found Walker to have "cervical muscle tenderness" but "satisfactory" forward flexion, extension and lateral rotation of the cervical spine. (Id. at 173.) In addition, she had "satisfactory" range of motion in her upper extremities, shoulders, and normal lumbar flexion. (Id.) Dr. Durant indicated that there was left knee "tenderness" with limited range of motion, but no swelling was detected. (Tr. at 173-74.) Dr. Durant ordered cervical, lumbar and left knee Magnetic Resonance Imagining ("MRI") tests. (Id. at 218.) However, the record indicates that only cervical, right shoulder and left knee MRIs were actually conducted.

### e. Walker's Three MRI Reports

On October 7, 1999, a right shoulder MRI indicated "acromion impingement on the supraspinatus muscle." (Id. at 193, 207.) Both the supraspinatus tendon and rotator cuff were found intact with no effusion detected. (Tr. at 193.) No other abnormalities were seen. (Id.)

An October 13, 1999 cervical spine MRI indicated a "reversal of the cervical curvature consistent with muscle spasm" and "herniations present along C5-C7." (Id. at 192.) The remaining cervical discs were unremarkable with no evidence of spinal stenosis or abnormal spinal alignment. (Id.)

A November 16, 1999 left knee MRI indicated "findings consistent with a tear in the medial meniscus and sprain of the medial collateral ligament." (Id. at 194, 208.) Lateral meniscus, lateral collateral and cruciate ligaments were found normal as was surrounding bony structures. (Id.)

### f. Physiatric Evaluations: Dr. Cruz-Banting

Walker underwent three physiatric evaluations at Hempstead Village Medical on October 14, 1999, November 11, 1999, and December 9, 1999. (Id. at 178-85.) Walker was seen by Dr. Imelda Cruz-Banting ("Dr. Cruz-Banting") during each visit and complained of similar neck, knee and low back pain over those visits. (Id. at 178-184.) Walker reported no change or improvement in her conditions during these visits with Dr. Cruz-Banting. (Id. at 181-84.) After receiving Walker's MRI results, Dr. Cruz-Banting's concluded that Walker suffered from cervical and lumbar sprains and left knee medial meniscal tear with sprain of the medial collateral ligament. (Id.) Dr. Cruz-Banting's treatment plan for Walker was to continue physical therapy three times a week with follow-up physiatric evaluations at Hempstead Village Medical. (Id. at 184.)

### g. Orthopedic Surgeon: Dr. Lim

On December 3, 1999, Walker was examined by orthopedic surgeon, Dr. Jimmy Lim ("Dr. Lim"). (Id. at 175.) Walker told Dr. Lim she felt right knee pain with persistent discomfort in daily activities despite therapy treatment. (Id.) Walker did not report any instability or locking in her left knee, but did report "throbbing" pain. (Id.) Dr. Lim's examination indicated Walker had a "mild impingement sign" regarding her right shoulder, pain during movement, but no neurovascular problems. (Id. at 176.) Cervical spine examination indicated range of motion was "satisfactory" in all directions. (Id.) Left knee presented discomfort with flexion and extension and positive signs of a meniscal tear. (Id.) Walker stated that she felt no knee pain upon palpation. (Id.) After looking at Walker's MRIs and his exam, Dr. Lim's impression was "torn [left knee] medial meniscus," "sprain with comminuted impingement of the right shoulder," and cervical and lumbar sprains. (Id. at 177.) Dr. Lim

recommended that Walker undergo left knee arthroscopic surgery. (Id.) Ultimately, Walker did not have arthroscopic knee surgery. (Id. at 136.) Dr. Lim prescribed the muscle relaxant Flexaril and anti-inflammatory and pain reliever Naprosyn. (Id. at 177.)

### h. Walker's Personal Physician: Dr. Dunn

On October 21, 1999, Walker was examined by her general practitioner, Dr. Dunn. (Id. at 165.) From October 1999 to June 2000 Dr. Dunn treated Walker for her hypertension with the medication Verapamil. (Id. at 162-165.) His treatment notes, however, do not indicate whether he diagnosed her with a specific type of hypertension. (Id.) During the October 21, 1999 visit, Dr. Dunn noted that Walker was "very obese" and found her left knee to be "tender, but [with] full range of motion." (Id. at 165.) No treatment plan was prescribed regarding her obesity or her left knee pain during the visit. (Id.)

On May 29, 2002, Walker visited Dr. Dunn complaining of abdominal pain. (Id. at 161.) Dr. Dunn referred Walker to the North Shore University Hospital. (Id.) Walker was admitted and released after three days once the hospital ruled out cholecystitis. (Id. at 111.) Walker's abdominal sonogram revealed a small hiatal hernia.[2] (Id. at 119, 122.) A chest x-ray indicated a "mild thoracic curve reversal and incidental azygos lobe." (Id. at 118.) Chest, lung and pleural surfaces were unremarkable. (Id.) Electrocardiogram ("EKG") indicated a normal sinus rhythm. (Id. at 116, 117.) Laboratory results were within normal limits. (Tr. at 120-21.) No other abnormalities were discovered. (Id.) The hospital physician prescribed Verapamil for her hypertension and Protonix for acid reflux. (Id. at 111.)

During her June 26, 2002 visit with Dr. Dunn, Walker complained of parasthesias along her right lower extremity and cramping in her right calf. (Id. at 161.) Dr. Dunn prescribed Axid

---

[2] Hiatal hernia is a "[p]rotrusion of the stomach upward into the mediastinal cavity through the esophageal hiatus of the diaphragm." Taber's Cyclopedic Medical Dictionary 891 (17th ed. 1993)

for acid reflux, in addition to Verapamil for hypertension. (Id.) Dr. Dunn's record indicated Walker suffered from "hypertension, morbid obesity, herniated nucleus pulposus in her cervical spine and gastritis."[3] (Id. at 161.)

That day, Dr. Dunn completed a Medical Report for Determination of Disability form. (Id. at 133-34, 153-54.) Dr. Dunn reported Walker's disabilities as: hypertension, morbid obesity, hiatal hernia, gastritis, herniated nucleus pulposus-cervical spine, and anemia. (Id. at 133, 153.) Dr. Dunn noted in the June 26, 2002 exam that Walker stood at five feet seven inches tall and weighed 300 pounds. (Id.) Dr. Dunn indicated by checking boxes on the form that Walker's "impairments" were "expected to last one year or more." (Id.) He signified that Walker's musculoskeletal system was "normal." (Id.) Additionally, Dr. Dunn indicated that Walker's lifting exertional function was "sedentary," reflecting an inability to lift more than ten pounds. (Id. at 134, 154.) Moreover, Dr. Dunn indicated that Walker's standing and/or walking, pushing/pulling, and sitting exertional functions were "less than sedentary," reflecting an inability to stand and/or walk for more than two hours a day, and an inability to sit for more than six hours a day. (Id.)

On her July 9, 2002 visit with Dr. Dunn, Walker complained of dizziness and neck, shoulder, and leg pain. (Id. at 161.) Dr. Dunn also completed a Musculoskeletal Medical Report exam. (Id. at 123-27, 155-59.) In this report, he noted that Walker suffered from headaches since 1999 and "recurrent neck pain" which "radiated to her shoulders and arms." (Id. at 123, 155.) Dr. Dunn found Walker's cervical flexion and extension movements were limited to 50% of normal. (Id.) Her left to right neck movements were found to be 60% of normal. (Id.) On the following page, Dr. Dunn noted that Walker had a "normal" cervical range of motion. (Id. at

---

[3] Herniated Nucleus Pulposus is "a protruding disc in the spine." Attorneys' Medical Deskbook §5:10 (4th ed. 2008.) In Walker's case, therefore, she has a protruding disc located within her cervical spine.

124, 156.) Additionally, on the form's range of motion chart, Dr. Dunn indicated Walker's cervical lateral flexion was 20 degrees out of 40; her cervical flexion-extension 15 degrees out of 30; and cervical rotation 30 degrees out of 45. (Id. at 126, 159.) Walker's shoulder forward elevation and abduction was 120 degrees out of 150 and her shoulder adduction ranges were normal. (Id. at 125, 158.) Walker's lumbar flexion-extension was 70 degrees out of 90 and her lumbar lateral flexion was 10 degrees out of 20. (Id. at 126, 158.) Her right knee flexion-extension was 100 degrees out of 120 and her left knee flexion-extension was normal. (Id. 125, 158.) Her hip range of motion was normal. (Id. at 126, 159.) Dr. Dunn also observed that Walker required assistance getting on and off the exam table. (Id. at 157.) Dr. Dunn's treatment plan for Walker was "diet" and "rest." (Id.)

On her August 28, 2002 visit with Dr. Dunn, Walker complained of insomnia, neck and back pain. (Id. at 160.) Walker stated that she was not able to exercise and was taking Verapamil, Dyazide, and Axid for her hypertension. Dr. Dunn discussed "diet" and "swimming" with Walker. (Id.) He also referred her to physiatry. (Id.)

During her September 12, 2002 visit with Dr. Dunn, Walker reported no changes in her back pain and that she had not sought physiatry treatments. (Tr. at 160.) Dr. Dunn again discussed "diet" and "swimming" with Walker. (Id.)

### 2. Plaintiff's SSI Application

#### A. Dr. Dunn's Report

On December 2, 2002, Dr. Dunn completed the Disability Determination Requirement form. (Id. at 128-132.) In this report Dr. Dunn diagnosed Walker with herniated nucleus pulposus-cervical spine, low back syndrome, morbid obesity, hypertension, hiatal hernia and gastritis. (Id. at 128.) Walker stood at five feet seven inches and weighed 305 pounds. (Id.)

Walker's symptoms at the time of her visit included pain originating in her neck and radiating down her legs and paresthesias along her right leg. (Id.) Dr. Dunn reported that Walker's neck and low back pain "waxes and wanes." (Id. at 129.) Dr. Dunn noted that Walker feels fatigued within minutes of activity and needs at least fifteen minutes of rest before resuming. (Id. at 130.) Dr. Dunn indicated that Walker was limited to carrying ten pounds, could only stand for less than two hours a day, and could sit no longer than six. (Id. at 131.) Dr. Dunn classified Walker's morbid obesity as a "condition significant to recovery." (Id.)

On February 23, 2004, Dr. Dunn completed a second Medical Report for Determination of Disability form, with an accompanying, second Musculoskeletal Medical Report exam. (Id. at 223-27.) Dr. Dunn diagnosed Walker's disabilities as: herniated nucleus pulposus-cervical spine, low back syndrome and morbid obesity and hypertension. (Id.) Walker stood at five feet seven inches and weighed 315 pounds. (Id. at 223.) Dr. Dunn indicated that Walker had "abnormal" musculoskeletal and cardiovascular systems. (Id.) He indicated Walker's lifting extertional function as "sedentary," reflecting an inability to lift no more than ten pounds. (Id. at 224.) Dr. Dunn indicated her standing and/or walking, pushing/pulling, and sitting exertional functions were "less than sedentary," reflecting an inability to stand and/or walk for more than two hours a day or sit more than six hours in a day. (Id.) Dr. Dunn's exertional function findings were the same as in his June 26, 2002 report.

### B. Evaluation by SSA Consulting Physicians

### 1. Dr. Weiss

On January 24, 2003, Walker was seen separately by two SSA consulting physicians Dr. Thomas H. Weiss ("Dr. Weiss") and Dr. Jasit Pawha "(Dr. Pawha") at Industrial Medicine Associates. (Id. at 136-144.) In her visit with Dr. Weiss, Walker complained of neck pain. (Id.

at 136.) She also claimed that she had right knee pain with some buckling and left knee pain with buckling and locking. (Id.)

Walker stated that her daily activities included some cooking, cleaning, and laundry, while her family did the majority of household chores. (Id. at 137.) Walker further noted to Dr. Weiss that she could not manage her money, care for children, socialize with friends, shower, bathe and dress without assistance. (Id.) She did acknowledge that she was able to watch television, go out, listen to the radio, read and engage in non-sporting crafts. (Id.) Dr. Weiss noted that Walker was taking the following medications at the time of the visit: Axid, Verapamil, Dyazide, Ambien and Tylenol. (Id.)

Dr. Weiss's physical examination found Walker's height to be five feet four inches and weight at 306 pounds without shoes. (Id.) She was found to be morbidly obese. (Id. at 138.) Walker's vital signs were within normal limits. (Id. at 137.) She had a normal gait with the ability to walk on her heels and toes without difficulty. (Id.) Nor did she have difficulty getting on or off the exam table or chair or removing and replacing her clothing. (Id. at 137A.) However, she was not able to squat due to knee pain. (Id. at 137.) Walker did not report using ambulatory assistive devices. (Id. at 137A.)

Dr. Weiss found Walker to have "full" cervical flexion-extension and lateral flexion and "full" rotary movements without pain or spasm. (Id.) Shoulder examination revealed "full range of motion" without joint inflammation, effusion, instability, muscle atrophy, or sensory abnormality. (Id.) Lower back examination revealed "full flexion and extension," and "full rotary movements." (Id.) Walker did state that she had "tenderness" along Lumbar 4 and the left sacroiliac region "both of which [were found] non-consistent." (Id.) Straight leg testing was positive in the supine position. (Id.) No trigger points, scoliosis, kyphosis or lumbar spasm were

detected. (Id. at 137A.) Left and right knee flexion was "limited" to 95 degrees due to "muscle and fat." (Id.) No stability or sensory abnormalities, atrophy, effusion or inflammation were detected in the lower extremities. (Id.) Dr. Weiss concluded Walker had "mild limitation" with the use of her back and "mild limitation" with household and grooming activities. (Id. at 138.) Dr. Weiss concluded that Walker had no other functional limitations. (Id. at 138.) Dr. Weiss did not make a specific Residual Functional Capacity ("RFC") determination.

### 2. Dr. Pawha

Walker's second SSA consulting physician exam on January 24, 2003 was with Dr. Pawha. (Id. at 139-44.) Walker's daughter accompanied her and described Walker's history of neck, back, and knee pain. (Id. at 139-40.) Walker stated that her daily activities included some light cooking and cleaning, where her family did most of the housework. (Id. at 140.)

Walker stood at five feet four inches and weighed 306 pounds. (Id.) Dr. Pawha categorized her as "obese." (Id.) Her vital signs were within normal limits. (Id.) Her EKG revealed a normal sinus rhythm with no abnormalities. (Id. at 144.) Her hemotology test showed normal blood and hematocrit levels. (Id.) Walker's gate was "mildly unsteady." (Id. at 140.) She was unable to walk on heels or toes or perform a full squat. (Id.) She was noted to have difficulty getting on and off the exam table and lying on her back, but was able to rise without a problem from the chair. (Id.) Her stance was found to be normal and she did not report the use of ambulatory assistive devices. (Id.)

Dr. Pawha's musculoskeletal examination revealed cervical extension limitation to 30 degrees, flexion limited to 40 degrees, and lateral flexion limited to 35 degrees bilaterally. (Id. at 141.) No thoracic abnormality or limitations were detected. (Id.) Lumbar spine flexion was limited to 70 degrees. (Id.) No shoulder limitations were detected. (Id. at 140.) Hip flexion was

limited to 70 degrees and both knees were limited to 110 degrees. (Id.) Straight leg test was positive. (Id.) All extremities revealed normal strength, with some edema, but no heat, redness, effusion, cyanosis, clubbing or muscle atrophy. (Id. at 141.) Motor sensory testing was normal. (Id.) Dr. Pawha concluded Walker had "mild to moderate" limitation for standing and walking, and "moderate" limitation for lifting, carrying, pushing and pulling. (Id. at 142.) He also determined Walker had no sitting limitations. (Id.) Dr. Pawha did not make a specific RFC determination.

### C. Plaintiff's RFC Assessment

Walker's RFC assessment was completed on February 3, 2003 by a consulting doctor for the SSA. (Id. at 145-52.) The identity of the medical consultant who performed the evaluation is not clearly known due to an unreadable signature on the SSA RFC form. (Id. at 152.) The consultant however found Walker to have a mildly unsteady gait, cervical herniations, cervical and lumbar range of motion limitations, lower extremity edema, neck pain, right knee instability, a weight of 306 pounds, and high blood pressure. (Id. at 146.) Based on these findings the consultant concluded Walker could frequently lift or carry ten pounds, stand and/or walk at least two hours in an eight hour workday, and sit about six hours in an eight hour workday with an unlimited ability to push and/or pull. (Id.) The consultant also determined Walker's postural movements such as climbing, balancing, stooping, kneeling, crouching and crawling to be occasionally limited. (Id. at 147.)

### D. Representative Testimony at the April 15, 2004 Hearing

Walker did not appear at her April 15, 2004. (Id. at 242.) Her attorney, Mr. Braxter, gave notice by sending a facsimile on April 14, 2004 informing the ALJ that Walker would not appear. (Id. at 233, 234.) In his notice to the ALJ, Mr. Braxter explained that Walker would not

attend because she could only travel by car, which she did not own, and she was unable to afford taxi transportation. (Tr. at 233, 234.) Mr. Braxter stated that he would be present at the April hearing, adding that he hoped an enclosed report would be "sufficient for a decision on the record." (Id.)

At the hearing, the ALJ expressed his hesitancy to proceed without Walker present to observe and question. (Id. at 242.) The ALJ offered Mr. Braxter an adjournment, but also stated that he was willing to hear Mr. Braxter's arguments. (Id.) Mr. Braxter declined the ALJ's offer, stating that Walker had "difficulty with following through on items" possibly because of mental health limitations. (Id. at 242-43.) The ALJ inquired whether depression may be one of Walker's "main problems" and asked if she had received any mental health counseling. (Id. at 243.) Mr. Braxter was not aware whether she received any such treatments. (Id.) Mr. Braxter further stated that a second adjournment would serve no purpose because he "d[id]n't know what other medical evidence could be obtained." (Id. at 245.)

As a result of Mr. Braxter's representations, the ALJ continued the hearing. Mr. Braxter represented that he believed Walker did suffer from "the physical problems the file indicate[d]," and referred to Dr. Dunn's findings and MRI reports. (Id. at 242.) He specifically argued that Walker's obesity and high blood pressure constituted impairments. (Id. at 245.) In addition to those impairments, Mr. Braxter argued, the cervical MRI results showed Walker had a herniated disk, which indicated nerve impingement. (Id. at 245-46.) The ALJ agreed to "take all of this into account," raising, however, an inconsistency in Dr. Dunn's June 26, 2002 Musculoskeletal Medical report. (Id. at 246.) The ALJ referred to Dr. Dunn's finding that Walker's cervical range of motion was normal, contrasting this finding from preceding and following pages of the report which established Walker's cervical motion to be significantly limited. (Id.) Again the

ALJ expressed his preference to have Walker present in order to "fill in the gaps." (Id. at 246.) Ultimately, the ALJ stated that he would "have to review the whole file again," and finalized the decision to proceed on the record in Walker's absence. The ALJ concluded the April Hearing by offering Mr. Braxter the opportunity to send in a post-hearing summary. (Id. at 247-48.)

## II.    LEGAL STANDARD

In order to receive SSI benefits a claimant must qualify as "disabled" within the meaning of the Social Security Act. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Under the Act, "disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant has a general burden of establishing that she suffers from a disabling impairment resulting from "anatomical, physiological, or psychological abnormalities" proven though "medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d). To be considered disabled, "[t]he impairment must be of such a severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Burgess v. Astrue, 537 F.3d 117, 119 (2d Cir. 2008) (internal quotation omitted); see also 42 U.S.C. § 423(d)(2)(A).

Regulations promulgated by the Commissioner set forth a five-step sequential analysis to determine whether the claimant is disabled. See 20 C.F.R. § 404.1520. The Second Circuit has summarized the Commissioner's five-step analysis as follows:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity;

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities;

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience;

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work;

5. If the claimant is unable to perform his or her past work, [or is found not to have a history of past relevant work,] the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on the fifth step, while the claimant has the burden of proving his case at steps one through four.

Shaw, 221 F.3d at 131.

This reviewing court must determine whether the Commissioner's conclusion was "supported by substantial evidence and based upon the proper legal standard, keeping in mind that it is up to the agency, and not this court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . [and if benefits are denied], the court shall review only the question of conformity with such regulations and the validity of such regulations." 42 U.S.C. § 405(g); see also Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). If there is not substantial evidence to support such factual findings, or a legal error does exist, the district court may set aside the Commissioner's conclusion that the claimant is not disabled. See Shaw, 221 F.3d at 131 (internal citation omitted). "Substantial evidence" means "more than a mere scintilla. It [is] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citation omitted).

The court must also review whether the claimant "has had a full hearing under the [SSA's] regulations and in accordance with the beneficent purposes of the Act." Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) (internal quotations and citation omitted). A full hearing requires the Commissioner to "affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Tejada v Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (internal quotations and citation omitted).

Under 42 U.S.C. § 405(g), the district court has the authority to affirm, reverse or modify the Commissioner's final decision. The district court may enter judgment "with or without remanding the cause for a rehearing." Sullivan v. Finkelstein, 496 U.S. 617, 629 (1990). "When the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse the ALJ's decision and order the payment of benefits. Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980). By contrast, "when there are gaps in the administrative record or the ALJ has applied an improper legal standard," the court may remand to the Commissioner "for the further development of the evidence." Parker, 626 F.2d at 235.

## III.  THE ALJ'S DECISION

After considering Walker's entire record the ALJ determined that Walker is not disabled and therefore not entitled to SSI benefits. (Tr. at 16.) In making his decision, the ALJ performed the required five-step evaluation analysis. At step one, the ALJ determined Walker had not engaged in substantial gainful activity since her alleged onset of disability. (Id. at 19.) Walker filed for SSI benefits on September 18, 2002. (Id. at 39.) The last day Walker reported to work for the Girl Scouts was June 15, 2002. (Id. at 63.) There is no indication in the record of work past this date. (Id.) At step two, the ALJ found Walker's degenerative disc disease, arthritis,

hypertension and obesity were "severe" physical impairments, limiting her ability to perform basic work activities. (Id. at 17.) However, at step three the ALJ determined that Walker's impairments when viewed singly or in combination did not meet or equal a listed impairment within the Regulations' Appendix. (Id.) At step four, the ALJ established that Walker's volunteer work experience with the Girl Scouts was "not significant past relevant work" and proceeded to step five. (Id. at 18.) At the last step, where the burden shifted to the ALJ to show what other work Walker could perform in the local and national economy, the ALJ determined that she had a residual functional capacity to perform a full range of sedentary work.[4] (Id. at 19, 20.)

The ALJ afforded little weight to the treating physician's opinion. The ALJ found the treating physician, Dr. Dunn, relied more on Walker's subjective statements than on objective medical evidence to conclude that Walker was disabled. (Id. at 17.) Further, the ALJ found the treating physician's opinion internally inconsistent as well as inconsistent with two SSA consulting physician opinions. (Id.) Moreover, the ALJ did not find Walker's statements alleging her symptoms and limitations to be fully credible. (Id. at 18, 20.)

## IV. DISCUSSION

### A. The ALJ's Evaluation of the Effects of Claimant's Obesity

Walker argues that the ALJ failed to properly consider the functional impact of her obesity in combination with her other impairments while assessing steps three, four and five of the five-step evaluation analysis. Walker claims that as a result, the ALJ applied an erroneous legal standard. (Plaintiff's Motion (Docket Entry # 11) 13.)

---

[4] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a). Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Social Security Ruling ("SSR") 83-10.

As of October 25, 1999, obesity is no longer an impairment listed under the SSA Regulations. <u>See</u> SSR 02-1p; 20 C.F.R. Part 404, Subpart P, Appendix 1. However, the ALJ is required to consider the effects of obesity in combination with other impairments throughout the five-step evaluation process, taking into account the claimant's RFC assessment. (<u>Id.</u>)

In step three, obesity can rise to the level of a disabling impairment under certain circumstances. The ALJ must find that obesity "meets" the requirements of a listing if claimant suffers from a listed impairment(s) separate from obesity. <u>See</u> SSR 02-1p. In Walker's case, hypertension, arthritis and degenerative disc disease do not meet or medically equal a listed impairment. <u>See</u> 20 C.F.R. Part 404, Subpart P, Appendix 1. Nevertheless, obesity may increase the severity of coexisting impairments which would in effect raise obesity to the level of an impairment listing, particularly in combination with musculoskeletal, cardiovascular and respiratory impairments. <u>See</u> SSR 02-1p. The Regulations dictate that obesity alone may be a medically equivalent listed impairment if claimant's obesity "results in an inability to ambulate effectively." (<u>Id.</u>)

Here, contrary to the Plaintiff's assertions, the ALJ considered the totality of Walker's impairments and her obesity (Tr. at 16.) The ALJ recognized that Walker's obesity was expected to have "a number of related complications, including hypertension, back pain and arthritis." (<u>Id.</u>) The ALJ reviewed the record for possible exacerbating effects of obesity on Walker's musculoskeletal system and impairments. (<u>Id.</u> at 17.) Based on the evidence in the record, the ALJ noted the "EMG nerve conduction studies of the lower extremities . . . were negative." (<u>Id.</u>) He noted there was "no evidence of compression fracture or deformity. . . . no observed muscle wasting, asymmetry or atrophy." (<u>Id.</u>) The ALJ also noted that Walker did not use assistive devices to conduct her daily activities and abilities. (<u>Id.</u>) Further, Walker's

cardiovascular impairment regarding her hypertension presented "no evidence of end organ damage. . . . retinopathy, cerebral vascular pathology or peripheral neuropathy." (Id. at 17.) No evidence was found of "ischemia, myocardial infarction or blockage in the blood vessels." (Id.) Her EKG exam, ordered by Dr. Pawha, indicated a normal sinus rhythm without abnormalities. (Id. at 143.) Walker did not claim to suffer from any respiratory impairment.

As defined within the Regulations, the "[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Part 404, Appendix 1 § 101.00B2b. Here, Walker had stated on questionnaires that she was able to do some house and yard work, go out alone, shop, socialize and play with her grandchild. (Tr. at 17, 80.) Furthermore, Walker has not asserted that she suffers any "extreme limitation" on her ability to walk, nor has she claimed reliance on assistive devices for ambulation. Therefore, the ALJ correctly determined Walker's obesity was not a medically equivalent listed impairment.

In steps four and five, the ALJ must evaluate obesity in conjunction with claimant's RFC by assessing the "effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." SSR 02-1p; see also Orr v. Barnhart, 375 F.Supp. 2d 193, 199 (W.D.N.Y. 2005) (obesity could affect claimant's exertional limitations and therefore must be considered in steps four and five). During this evaluation, the ALJ bears in mind "[t]he combined effects of obesity with other impairments . . . ." SSR 02-1p; see also Orr, 375 F. Supp. 2d 193, at 199 (citing Willoughby v. Comm'r of Soc. Sec., 332 F. Supp. 2d 542, 549 (W.D.N.Y. 2004). Moreover, "[w]hen an ALJ's decision adopts the physical limitations suggested by reviewing doctors after examining the [claimant], the claimant's obesity is understood to have been factored into their decision." Guadalupe v. Barnhart, No. 04-CV-

7644(HB), 2005 U.S. Dist. LEXIS 17677, at *20 (S.D.N.Y. Aug. 24, 2005) (citing Skarbek v Barnhart, 390 F.3d 500, 504 (7th Cir. 2004). However, "[t]hose circuits which have recently commented on this complaint have held that an ALJ's failure to explicitly address a claimant's obesity does not warrant remand." Guadalupe, 2005 U.S. Dist. LEXIS 17677, at *20 (citing Rutherford v. Barnhart, 399 F.3d 546, 552-53 (3d Cir. 2005); Skarbek, 390 F.3d at 504).

Here, the ALJ did consider the reviewing doctors' findings that Walker was "morbidly obese," at "67 inches tall" and "315 pounds," with a "body mass index of 49.[5]" (Tr. at 16.) The ALJ recognized the combined effect of obesity with Walker's other impairments, stating: "[a]s would be expected, she suffers from a number of related complications." (Id.) The ALJ referenced Walker's chiropractor, Dr. Biegel, who opined that Walker suffered from "paravertebral muscle spasm throughout the cervical, thoracic and lumbar spine." (Id. at 17.) The ALJ also referred to Walker's MRI results which revealed "herniation at C5-C6 and C6-C7 with anterior thecal sac compression." (Id.) Her left knee MRI indicated a "sprain of the medial collateral ligament consistent with tear of the posterior horn medial meniscus," and Walker's right shoulder MRI indicated a "comminuted impingement of the supraspinatus muscle." (Id.) The ALJ also took into account exam notes from Walker's treating physician, Dr. Dunn, who opined Walker's "reflexes and sensory examination were normal [and r]ange of motion was not significantly compromised." (Id.) The ALJ further considered the views of Walker's consultative examiner, Dr. Pawha, who concluded that Walker was "not restricted for sitting" with "mild to moderate restriction for standing and walking," and "moderate restriction for lifting, carrying, pushing and pulling," with "normal" finger-hand dexterity. (Id.) The ALJ also relied on "both consultative examiners [who ultimately] opined the claimant could perform a

---

[5] A Body Mass Index is a measurement based on a person's height and weight. (Id. at 239.) Examples of BMI categories and ranges are: "underweight = <18.5; normal = 18.5-24.9; overweight = 25-29.9; obesity = 30 or greater." (Id.)

greater range of work" than that determined by Dr. Dunn. (Tr. at 17.) Reviewing the record as a whole, the ALJ properly determined that Walker's obesity did not affect her functional capacity to perform a full range of sedentary work. (Id. at 18, 20.)

**B. The Treating Physician Rule**

Walker contends that the ALJ applied an erroneous legal standard when he dismissed Dr. Dunn's opinion as controlling, and that the ALJ did not develop the record fully when identifying inadequacies in Dr. Dunn's opinion. (Plaintiff's Motion 11-13.) The ALJ concluded that the opinion by Dr. Dunn was not entitled to controlling weight because it was not supported by sufficient objective medical evidence. Additionally, the ALJ found that Dr. Dunn's opinion was internally inconsistent, and inconsistent with substantial evidence presented in the record, including Walker's own statements. (Tr. at 17-18.)

A treating physician's opinion is given "controlling weight" when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); see also Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999). If the treating physician's diagnosis is inconsistent with other substantial evidence, such as other medical opinions, the treating physician's opinion generally will not be given controlling weight. See Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008). Further, "[i]f the opinion of the treating physician as to the nature and severity of the impairment is not well supported by objective evidence, the obligation to give controlling weight is inapplicable." Schnetzler v. Astrue, 533 F. Supp. 2d 272, 284 (E.D.N.Y. 2008) (internal quotations omitted).

If controlling weight is not given to the treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight to give the opinion: "(1)

length of the treatment and frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors." 20 C.F.R. § 404.1527(d)(2)-(6). After considering the above factors the ALJ must provide "good reasons" for the weight he ultimately affords the treating physician's opinion. (Id.)

Regarding the ALJ's duty to develop the record fully, the ALJ must "first attempt[] to fill any clear gaps in the administrative record" before overriding the treating physician's opinion. Burgess, 537 F.3d at 129. (quoting Rosa, 168 F.3d 72, at 79). Likewise, if the ALJ finds the treating physician's opinion "inadequate" to determine disability, the ALJ is obligated to seek further information from the treating physician. Clark, 143 F.3d at 118; see also 20 C.F.R. § 416.912(e).

In the present case, the ALJ found Dr. Dunn's conclusions unsupportable without medical explanation. (Tr. at 17). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the ALJ] will give that opinion." 20 C.F.R. § 404.1527(d)(3); see also Alvarado v. Barhhart, 432 F. Supp. 2d 312, 321 (W.D.N.Y. 2006) (treating physician's opinion "must be discounted" where it is "too brief and conclusory [and] wholly unsupported by any medical evidence, treatment notes, specific findings, or clinical or diagnostic techniques"). The ALJ recognized Dr. Dunn's finding that Walker's neck range of motion was 50% of normal, but emphasized Dr. Dunn did not provide a reason why this particular condition or Walker's other conditions would make her only capable of less than sedentary activity. (Tr. at 17.) The ALJ also noted that Dr. Dunn's June 26, 2002 and February 23, 2004 Medical Report for Determination of Disability exams, which were both accompanied with Musculoskeletal Report exams, indicated that Walker's exertional functions were less than sedentary. (Id. at 154-59, 224-29). However, it is unclear what Dr.

Dunn's basis was for his conclusion without added comment, treatment notes or objective medical evidence used as support. (Tr. at 154-59, 224-29.) Furthermore, in these same exams, Dr. Dunn diagnosed Walker as having hypertension, obesity, hiatal hernia, gastritis, herniated nucleus pulposus-cervical spine, anemia and low back syndrome, but Dr. Dunn did not indicate generally or specifically which, if any, condition prohibited Walker from performing sedentary work. (Id.) Dr. Dunn did not support or reference his conclusions with Walker's MRI results which otherwise indicated injuries. (Id.) At no point in the record did Dr. Dunn explain the significance of Walker's MRI results alone or in relation to Walker's diagnosed degenerative disc disease, morbid obesity or herniated nucleus pulposus-cervical spine. (Id. at 153-65, 222-27.) Similarly, in his two Musculoskeletal Reports, Dr. Dunn conducted full body range of motion exams, which indicated cervical, lumbar, shoulder and knee limitations, but he did not utilize medical or laboratory evidence provided in the record to support his conclusion. (Id. at 155-59, 225-27.) For instance, Dr. Dunn did not reference the opinions from specialists Dr. Biegel, Dr. Imelda Cruz-Banting, or Dr. Lim, nor did he mention Walker's X-Ray results, EKG, EMG and Hemotology reports. (Id.) These exams appear to indicate that Dr. Dunn relied on Walker's subjective responses during the exam rather than on available medical opinions and objective medical evidence. (Id. at 154-59, 224-29.)

Moreover, the ALJ found an inconsistency within Dr. Dunn's records. In Dr. Dunn's July 9, 2002 Musculoskeletal Report exam, he found Walker's cervical flexion, extension and left to right movements were limited to 50% and 60% of normal. (Id. at 155.) On the following page of this same report, without clarification, Dr. Dunn found Walker's cervical range of motion was "normal," having no cervical limitation. (Id. at 156.)

In addition, both Dr. Weiss and Dr. Pawha's opinions were ultimately contrary to Dr. Dunn's conclusion. Dr. Dunn had concluded that Walker was incapable of standing or walking longer than two hours a day and incapable of sitting for longer than six. (Tr. at 154, 224.) Dr. Weiss opined that Walker had only a "mild" back limitation, with a "mild limitation [regarding] household activities and personal grooming." (Id. at 138.) No other limitations were noted by Dr. Weiss. (Id.) Dr. Pawha concluded that Walker had "no sitting restrictions" all together, and only "mild-to-moderate restriction for standing and walking," and "moderate restriction for lifting." (Id. at 142.)

It is for the ALJ to resolve inconsistencies within presented medical evidence. See Burgess, 537 F.3d. at 128. "The more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20 C.F.R. § 404.1527(d)(4); see also Snell v. Apfel, 177 F.3d. 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given.").

Dr. Dunn was Walker's treating physician from October of 1999 to February 2004.[6] SSA Regulations state that the ALJ must consider, among other factors, the length and nature of the treatment relationship between the claimant and treating physician. See 20 C.F.R. § 404.1527(d)(i)(ii). Generally, more weight will be given to a treating physician the longer the doctor has treated the claimant, in connection with the ALJ's duty to consider "the treatment the source has provided and . . . the kinds and extent of examinations . . . performed or ordered" by the treating physician. (Id.) The record indicates that Dr. Dunn treated Walker's hypertension

---

[6] The last indication in the record that Dr. Dunn was Walker's treating physician was a March 26, 2004 hand written doctor's note which stated: "Mrs. Walker has a herniated disc. She has limited ability to walk and stand. She requires taxi transport." (Tr. at 222.)

and hernia by prescribing Verapamil and Axid respectively. (Tr. at 75, 83, 160-65.) Dr. Dunn also prescribed Ambien as a sleeping aid for Walker. (Id. at 75.) The only other treatment plan suggested by Dr. Dunn throughout the record was "rest," "diet," and "swimming," but it is unclear without explanation what he intended to accomplish, what the actual plans were, and to what impairment the plans were directed. (Id. at 157, 160.) He did refer Walker to physiatry in a note, but again, no explanation was attached to justify why and to what end he did so. (Id. at 160.) Walker never sought physiatry treatment beyond her initial 1999 treatments. (Id. at 160, 195-97.)

The ALJ has an obligation to develop the record when the treating physician's opinion is "inadequate" to determine whether a claimant is disabled. See 20 C.F.R. § 416.912; see also Burgess, 537 F.3d at 129. If there is an inadequacy, the ALJ must recontact the medical source and obtain additional information. See 20 C.F.R. § 416.912. In the present case, the ALJ did not find Dr. Dunn's conclusion inadequate. (Tr. at 17.) Instead, he found that considering the record as a whole, Dr. Dunn's residual functional capacity opinion had "little weight." (Id.) In light of the full record, the ALJ was able to conclude Walker was not disabled. (Id. at 17, 20.)

Moreover, per Burgess, the ALJ did "attempt to fill any clear gaps" before dismissing Dr. Dunn's opinion as controlling, by offering Mr. Braxter an adjournment at the April Hearing. (Id. at 242.) Yet, Mr. Braxter declined the ALJ's offer, continuing with the hearing and representing that he "d[idn't] know what other medical evidence could be obtained." (Id. at 245.) As exemplified, over a year had passed from the April Hearing to the time of Mr. Braxter's submission of memorandum to the Appeals Council, which did not contain any new or material medical information not already supplied for the ALJ's consideration. (Id. at 4, 228-32, 235-39.)

27

After considering Dr. Dunn's opinion, which was found to be supported by "few objective findings," and the opinions by two consulting physicians, the ALJ correctly reasoned that these "omissions" and "inconsistencies," could only afford "Dr. Dunn's residual functional capacity little weight." (Id. at. 17.)

### C. Credibility

Although Walker does not explicitly raise the issue, the court notes that the ALJ considered the credibility of Walker's subjective statements of pain in determining that she was not disabled. (Id. at 18.) In making his assessment, the ALJ considered whether Walker's statements of pain could reasonably have been accepted as consistent with the objective medical evidence presented in the record. He considered all the medical opinions which reflected judgments about the nature and severity of her impairments, as well as Walker's work history. (Id.) The ALJ's determination that Walker's statements were "not fully credible" is supported by substantial evidence.

The SSA Regulations state a claimant's subjective statements of pain or other symptoms alone will not establish disability. See 20 C.F.R. § 416.929(a). "There must be medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain . . . alleged." (Id.) Further, the ALJ "does not have to accept [claimant's] subjective testimony about her symptoms without question." Kendall v. Apfel, 15 F. Supp. 2d 262, 267 (E.D.N.Y. 1998). When the subjective complaints exceed what would reasonably be expected from the objective medical evidence, the ALJ examines such factors as: (1) claimant's daily activities; (2) location, duration, frequency of pain; (3) precipitating factors; (4) type of medication prescribed to alleviate the pain; (5) and other treatments used to relieve the pain. See 20 C.F.R. § 416.929(3); see also SSR 96-7p. In

addition, the ALJ considers the claimant's past work experience since "good work history may be deemed probative of credibility." Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998). Ultimately, however, it is for the ALJ to decide the weight of claimant's credibility and not a function of the district court. See Aponte v. Sec'y of Health and Human Serv., 728 F.2d 588, 591 (2d Cir. 1984); see also Snell, 177 F.3d at 135 (where there is conflicting evidence about the claimant's pain, the ALJ must make credibility findings). If there is substantial evidence that supports the ALJ's decision to discount the claimant's credibility then the court must uphold that determination. See Aponte, 728 F.2d at 591.

In the present case, Walker has alleged disability due to hypertension, herniated nucleus pulposus-cervical spine, low back syndrome, and morbid obesity. (Tr. at 223.) Over numerous exams with her treating, consulting and specialist physicians, Walker generally described suffering from neck and knee "pain." (Id. at 133, 136, 139, 166, 172, 175, 178.) However, during one examination, she stated that the neck pain "wax[ed] and wane[d]." (Id. at 129.) Walker did have laboratory findings which suggested support for her existing injuries.[7] (Id. at 103, 104.) Walker's June 19, 1999 X-Ray revealed an "increased abnormal curvature of the lumbar spine, reversal cervical spine C3-C7 and jamming of the posterior articular facets." (Id. at 202.) Walker's cervical MRI revealed "posterior disc herniations in C5-C6 and C6-C7." (Id. at 104.) Her left knee MRI revealed "sprain of the medial collateral ligament. Findings consistent with a tear in the posterior horn of the medial meniscus." (Id. at 103.) She also had a body mass index of 49.3, a finding well over the threshold of the obesity category. (Id. at 239.)

---

[7] "Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of a medically acceptable laboratory diagnostic techniques, e.g. "chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." 20 C.F.R. § 416.928(c).

However, Walker's treating physician's prescribed course of treatment does not indicate a plan to control Walker's alleged pain; nor does he include his judgment or opinion referring to the severity of Walker's pain. (Tr. at 153-65, 222-27.) From October 1999 to February 2004, the years in which Walker was seen as Dr. Dunn's patient, Dr. Dunn did not address Walker's alleged complaints of neck, back, and knee pain with a specific course of treatment. (Id. at 153-65, 222-27.) The record gives no indication that Dr. Dunn was treating Walker's pain. (Id.) During the years as Walker's treating physician, Dr. Dunn had prescribed Ambien, Axid and Verapimil, medications which treated Walker's sleeping disorder, hernia and high blood pressure respectively. (Id. at 75, 83.) However, no pain relief medications were prescribed by Dr. Dunn to treat the pain Walker allegedly suffered from. (Id. at 153-65, 222-27.) Walker was prescribed Tylenol, Flexiril and Naprosin following her 1999 motor vehicle accident, but there is no evidence in the record that Walker continued to rely upon these pain relieving medications past the initial months following her accident. (Id. at 199, 218.) Dr. Dunn did note having a "discussion" advising Walker to begin a "diet" and to try "swimming" during her August 28, 2002 and September 12, 2002 visits. (Id. at 160.) Yet his plan, which was not detailed or explained in the record, suggests it related more to her obesity than to her allegations of pain. (Id.) At the August 28, 2002 visit, Dr. Dunn also referred Walker to physiatry, suggesting that she undergo physical therapy, again a plan without explanation. (Id.) The record does not reflect that Walker underwent any physical therapy treatments past the initial months of her 1999 accident, despite her allegations of pain and general compliance with medical treatment observed by Dr. Dunn. (Id. at 133, 160, 223.)

Additionally, as provided under 20 C.F.R. § 416.9299(c)(3), Walker's poor work history was another factor considered by the ALJ in weighing her credibility. See also Schaal, 134 F.3d

at 502. Walker was employed by the Girl Scouts as a part-time volunteer from 1989 to 2002, working three days a week and earning $200 a month. (Id. at 73.) No other job history was shown in the record. (Id.) Further, the record does not indicate that Walker attempted to find other work since the onset of her alleged disability, regardless of her stated daily activities and abilities which included caring for her grandchild, cooking, household chores, taking taxis, going out alone, shopping in stores, and socializing. (Id. at 78-82.) Therefore, based on the substantial evidence addressed above, the ALJ correctly discounted Walker's credibility.

### D. Walker's Ability to Perform a Full Range of Sedentary Work

Although Walker did not contest whether the ALJ sustained his burden in step five of the sequential evaluation process, establishing her capability to perform sedentary work, it is important to state that the ALJ's RFC determination is made without error and supported by substantial evidence. As defined by the SAA Regulations, a full range of sedentary work "requires occasional walking and standing, modest prescribed lifting capability, and the capability to sit for long periods of time." Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998); see also 20 C.F.R. § 404.1567(a). Sedentary work "generally involves up to two hours of standing or walking and six hours of sitting in an eight hour work day." SSR 83-10. The ALJ must establish that the claimant can perform these sedentary RFC functions on a regular and continuing basis. See SSR 96-8p. A "regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." (Id.)

In the instant case, the ALJ's conclusion that Walker "can perform the demands of a full range of sedentary work" is supported by substantial evidence. (Tr. at 19.) The evidence that the ALJ relied upon in reaching his decision included two consulting physician opinions, objective medical findings, and Walker's admitted abilities and activities. In step five the ALJ has the

burden "to prove" that Walker can perform sedentary work, based on the ability to sit for six hours in a day. See Curry v. Apfel, 209 F.3d 117, 123 n.1 (2d Cir. 2000.) Dr. Pawha had concluded that Walker had "no sitting restrictions" whatsoever, with "mild to moderate" standing and walking limitations. (Tr. at 17, 142.) Dr. Weiss concluded that Walker had only "mild limitation" with the use of her back, but discovered no sitting or lower extremity limitations. (Id. at 138.) Further, Walker did not require the use of ambulatory devices for assistance in her activities; nor were assistive devices ever prescribed by her physicians. (Id. at 17, 137A, 140.) In 1999, arthroscopic knee surgery was recommended, but Walker elected not to have it. (Id. at 175.) Nonetheless, in a 2002 disability questionnaire, Walker stated she was able to watch television, play with her grandchild, perform multiple indoor and outdoor chores, go out alone, food shop, and socialize. (Id. at 80-82.) The record does not specifically indicate how long she was able to sustain these activities other than Walker's one statement explaining she needed to stop and rest "for a while" before continuing to walk. (Id. at 84.) However, the ALJ found her statements not fully credible without objective supportive evidence. Therefore, based on the evidence addressed above, the ALJ met his burden of proof that Walker can perform a full range of sedentary work.

### E. Walker's Absence at Hearing

Walker contends that the ALJ committed reversible error by failing to provide her the opportunity to testify by telephone at the April 15, 2004 hearing. (Plaintiff's Motion 15.) In a case where claimant is unable to attend the hearing, the ALJ may provide the claimant the opportunity to testify by video teleconferencing. See 20 C.F.R. §§ 416.1450(e), 416.1436(c). The Regulations do not, however, provide the claimant the use of a telephone to testify before an ALJ. (Id.) If the claimant requests to appear at the hearing by video conferencing, the claimant

must notify the ALJ at the earliest possible time of her request and state her objection to the scheduled time and place. See 20 C.F.R. § 416.1436(c).

On September 4, 2003, the ALJ notified Walker of her rights to be represented at the April Hearing. (Tr. at 36.) On March 19, 2004, notice was given to Walker of the time, date, and place for the April Hearing. (Id. at 22-25.) On April 9, 2004, Walker appointed Mr. Braxter as her representative. (Id. at 21.) Despite Mr. Braxter's facsimile the day before the hearing informing the ALJ that Walker would not appear, neither Walker nor Mr. Braxter objected to the scheduled hearing or requested a new hearing date. (Id. at 36-38, 233, 234.) Moreover, Walker never requested the opportunity to testify via video teleconferencing at the time. (Id. 233, 234.) Instead, Mr. Braxter stated that he would be present for the hearing, adding his expectation that the report he provided would be "sufficient for a decision on the record." (Id.) Mr. Braxter agreed to proceed and represented that the record would be complete without Walker's testimony. The ALJ did not commit reversible error by not offering Walker the chance to testify over the telephone, a complaint she raises the first time on appeal.

**IV.    CONCLUSION**

For the foregoing reasons, the ALJ properly considered Plaintiff's obesity as an impairment, correctly applied the treating physician doctrine, and provided the opportunity for a full and fair hearing. Therefore, the Commissioner's motion is granted.

The Clerk of Court is directed to close the case.

SO ORDERED.

s/ NGG

Dated: Brooklyn, New York
July 23, 2009

NICHOLAS G. GARAUFIS
United States District Judge